FILED

2016 Feb-23  AM 08:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| OIL EQUIPMENT COMPANY, INC., | } } } | |
| **Plaintiff,** | } } } | |
| v. | } } | **Case No.: 2:14-cv-00014-MHH** |
| MODERN WELDING COMPANY, INC.; MODERN WELDING COMPANY OF GEORGIA, INC.; MODERN WELDING COMPANY OF FLORIDA, INC., | } } } } } | |
| **Defendants.** | } } } | |

## MEMORANDUM OPINION

This dispute concerns an underground storage tank. Oil Equipment Company, Inc. (OEC) bought the tank from Modern Welding Company of Georgia, Inc. When problems arose with the tank, OEC contacted Modern Welding for assistance. When Modern Welding failed to address the problems to OEC's satisfaction, OEC filed suit against Modern Welding.[1]

Questions concerning the tank's installation and the existence and cause of any damage to or defects in the tank form the core of the controversy between the parties. Because of OEC's mishandling of essential evidence, the company cannot

---

[1] OEC also sued Modern Welding's parent company, Modern Welding Company, Inc., and another subsidiary, Modern Welding Company of Florida, Inc. The Court has dismissed those claims. (Doc. 49).

carry its burden of proof on its claims; Modern Welding cannot investigate and defend against OEC's allegations; and the Court cannot adequately examine and resolve motions pertaining to those allegations. The spoliation of evidence creates an insurmountable hurdle that warrants dismissal of this action. Consequently, for the reasons explained in greater detail below, the Court denies as moot Modern Welding's motion to exclude the report and testimony of OEC's expert witness, OEC's motion to strike the report of Modern Welding's expert, and Modern Welding's motion for summary judgment. (Docs. 35, 40, 45).

## I.    FACTUAL BACKGROUND

Among other business activities, OEC constructs and maintains gas stations and convenience stores. (Doc. 43-5, p. 10). While constructing a gas station in Montgomery, Alabama for Interstate Oil Company, OEC bought a Glasteel II underground storage tank from Modern Welding. (Doc. 41-1, pp. 14, 44–45, 74–75). OEC installed the tank on June 9, 2010, and the OEC employee supervising the installation partially completed an installation checklist provided by Modern Welding. (Doc. 41-1, pp. 14, 44–45; Doc. 43-6, p. 6). The OEC employee failed to check an answer to the question, "Has special care been used to ensure backfill compaction along the tank's bottom quadrant?" (Doc. 41-1, p. 19; Doc. 43-6, p. 12). The limited warranty that Modern Welding provided on Glasteel II tanks is conditioned in part upon installation "in accordance with the installation

2

instructions" and "the return of the completed installation checklist within 30 days of installation . . . ." (Doc. 41-1, p. 43). Modern Welding received the installation checklist from OEC on September 23, 2010, more than two months beyond the warranty deadline. (Doc. 41-1, p. 44).[2]

Glasteel II tanks are "composed of a steel primary tank . . . and a secondary containment tank made of fiberglass." (Doc. 41-2, p. 9). The steel and fiberglass tanks are separated by an annular or interstitial space, and a monitoring pipe that runs through the steel tank allows this interstice to be checked for liquids. (Doc. 41-2, pp. 9–10). The tank that OEC bought had a bulkhead wall that divided the steel compartment into 8,000- and 4,000-gallon sections. (Doc. 41-2, pp. 9, 12–13). When Modern Welding delivered the tank for installation the wall was intact and able to hold a vacuum seal. (Doc. 41-1, pp. 17, 35; Doc. 43-6, p. 4).

Less than a year after OEC installed the tank, the vacuum seal was breached. Modern Welding visited the installation site in March of 2011 to remove water from the interstitial space between the inner steel tank and the fiberglass shell and reestablish a vacuum. (Doc. 41-1, pp. 22, 56). A year later, Interstate reported to OEC that diesel fuel was leaking into the interstice. (Doc. 41-1, p. 13; Doc. 41-4). OEC alerted Modern Welding to the issue and had a company called National

---

[2] The parties have not raised the issue, but the Court notes that OEC apparently failed to satisfy the conditions for coverage under the limited warranty.

Tank Monitor assess the tank.  (Doc. 41-1, pp. 13, 19, 60–68).  National Tank Monitor reported a "below product level (wet) portion leak."  (Doc. 41-1, p. 63).

OEC excavated the top of the 8,000 gallon compartment, and Modern Welding hired C&S Petroleum to remove the fuel stored there, cut an access opening, and enter and clean the tank.  (Doc. 41-1, pp. 28–29, 71).  Modern Welding also hired Superior Services to inspect the tank.  Superior Services "could detect no breach in the primary tank," but "did detect a breach in the outer secondary fiberglas[s] shell . . . ."  (Doc. 41-1, p. 73; Doc. 41-2, pp. 27–28, 40–41).  Superior Services removed a liquid from the interstice, but the liquid was an "oily water substance," not diesel fuel.  (Doc. 41-1, p. 73).  In its report, Superior Services noted that C&S Petroleum had observed a "2' x 7' flat spot" on the bottom of the tank near the bulkhead, and Modern Welding had taken photographs of the flattened area.  (Doc. 41-1, p. 71; *see also* Doc. 41-1, pp. 15–16, 56).

In a letter dated October 2, 2012, counsel for OEC demanded that Modern Welding honor the limited warranty provided with the tank by supplying a replacement tank or refunding the purchase price.  (Doc. 41-1, pp. 43, 52).  OEC advised Modern Welding that failure to honor the warranty would cause OEC to "seek recovery of **all** of its costs . . . ."  (Doc. 41-1, p. 52) (emphasis in original).  Modern Welding responded on October 4, 2012 that any damage to the tank "resulting from improper installation would not be covered by the warranty."

(Doc. 41-1, p. 57).  Modern Welding suggested that OEC may not have installed the tank properly because the tank was able to hold a vacuum seal when Modern Welding delivered the tank to OEC.  As additional support for its theory of improper installation, Modern Welding pointed to the flattened area at the base of the steel compartment that was observed after installation and the failure of OEC's employee to confirm on the installation checklist that the backfill had been properly compacted along the tank's bottom quadrant.  (Doc. 41-1, pp. 44–45, 56–57).  Modern Welding requested advance written notice of the tank's exhumation, so that Modern Welding could send a representative to the exhumation to assess whether the tank's condition was due to improper installation or defects in the tank's materials or manufacture.  (Doc. 41-1, p. 57).

OEC ignored Modern Welding's request and exhumed the tank on October 16, 2012 without providing notice to Modern Welding.  (Doc. 41-1, p. 24).  OEC's expert attended the exhumation and conducted a grain size analysis of the backfill material while the tank was being removed.  (Doc. 41-3, pp. 3, 39, 41).  OEC determined that a liquid present in the excavation appeared to be groundwater. (Doc. 41-1, p. 29).  After the tank was removed, a new tank bed was prepared and a new tank installed.  (Doc. 41, p. 23).  The process of preparing the new bed and installing the new tank destroyed any evidence that may have existed concerning the manner in which the original tank was installed.  (Doc. 41-3, p. 7).

Following the exhumation, the original tank was placed in an open field owned by an OEC employee.  (Doc. 41-1, p. 31).  Because the tank was not covered, exposure to ultraviolet radiation from the sun caused the fiberglass shell to degrade.  (Doc. 41-1, pp. 31, 33; Doc. 41-7, pp. 1–3).  After the tank had been exposed to the elements for nearly one year, OEC filed this action.  (Docs. 1, 1-1).  Modern Welding's expert examined the tank on May 30, 2014 and offered the opinion that "due to improper storage and preservation, weather exposure, and handling, there is no way anyone can now determine what might have caused the crack in the outer fiberglass shell of the tank."  (Doc. 41-9, p. 9).  While this litigation was ongoing, and without providing notice to Modern Welding or the Court, "OEC had the bottom portion of the tank cut out and tested" to determine if the bulkhead welds were defective.  (Doc. 44, p. 57).

The parties have filed motions pertaining to the impact of the spoliation of evidence on this litigation.  The parties have briefed the motions, and the issues are ripe for resolution.

## II.    DISCUSSION

OEC's destruction of evidence hampers the company's ability to proceed against Modern Welding on claims under the Alabama Extended Manufacturers' Liability Doctrine (AEMLD) and for breach of contract, express warranty, and implied warranties.  (Doc. 44, p. 5).  Under the AEMLD, "the burden of proof rests

6

with the plaintiff to prove that the product left the defendant's control in an unreasonably dangerous condition and not fit for its expected use, and that that which caused the product to be in such an unfit condition in fact caused the injury." *Bell v. T.R. Miller Mill Co.*, 768 So. 2d 953, 957 (Ala. 2000). Although "identification of an existing defect is not essential to recovery upon an express warranty," a plaintiff must bring forward evidence that "shows, either directly or by permissible inference, that the [product in question] was defective in its performance or function or that it otherwise failed to conform to the warranty." *Barko Hydraulics, LLC v. Shepherd*, 167 So. 3d 304, 310 (Ala. 2014), *reh'g denied* (Nov. 21, 2014). "If a company . . . wishes to warrant only defects in material and workmanship, then it may do so; with such a warranty, the plaintiff would have to show that the product was defective in order to show that the goods did not conform to the warranty." *Ex parte Miller*, 693 So. 2d 1372, 1376 (Ala. 1997) (footnote omitted).[3]  The implied warranties of merchantability and fitness for a particular purpose require a plaintiff to show that the goods are not "fit for the ordinary purposes for which such goods are used" or fit for the "particular purpose for which the goods are required," respectively.  §§ 7-2-314, 7-2-315 (Ala. Code 1975).

---

[3] The holdings in *Barko* and *Ex parte Miller* appear to be in tension.  However, *Barko* does not overrule *Ex parte Miller*, but rather relies on it for the proposition "that the identification of an existing defect is not essential to recovery upon an express warranty."  *Barko*, 167 So. 3d at 310 (citing *Ex parte Miller*, 693 So. 2d at 1376).  Accordingly, the Court will interpret both cases so as to minimize any apparent contradictions.

When asked to "[d]escribe in detail any and all alleged design and/or manufacturing defects in the Tank," OEC asserted that the tank "was (a) improperly designed and manufactured due to a defectively designed bulkhead joint and/or (b) failed due to a defective weld at the bulkhead." (Doc. 41-5, p. 6). Similarly, when asked to specify how Modern Welding had "breached any contractual obligations and/or warranties," OEC responded that Modern Welding had sold OEC "a tank that was defectively designed and/or manufactured because it had a defectively designed bulkhead joint and/or was manufactured with a defective or inadequate weld at the bulkhead joint." (Doc. 41-5, p. 15). In its brief opposing Modern Welding's motion for summary judgment, OEC argued the crack in the fiberglass shell demonstrated that Modern Welding had breached the limited or implied warranties that covered the tank and that the tank was unreasonably dangerous. (Doc. 44, pp. 43, 50, 51).

OEC has not cited materials in the record that would support the assertion that the tank's bulkhead welds were defective, and OEC's opposition to Modern Welding's motion for summary judgment implicitly abandons the claim. (Doc. 44, pp. 56–57). In contrast, both parties have produced evidence that the tank developed a crack in its fiberglass shell. (Doc. 41-1, pp. 11, 32, 34, 71–73; Doc. 41-3, pp. 16–17; Doc. 41-6, p. 2; Doc. 43-1, p. 49; Doc. 43-4, p. 3). Regardless of whether OEC identifies the defect in the tank as faulty bulkhead welds or a cracked

fiberglass shell, OEC cannot prove that the defect was a manufacturing defect that was present in the tank at the time of delivery. If the tank's failure was due to OEC's improper installation, then Modern Welding would not be liable under any of the theories advanced by OEC. Because of OEC's spoliation of evidence, it is impossible to determine what caused the crack.

In the Eleventh Circuit, "federal law governs the imposition of spoliation sanctions . . . because spoliation sanctions constitute an evidentiary matter." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). Sanctions for spoliation may include "(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator." *Id.* at 945. A sanction of dismissal "should only be exercised where there is a showing of bad faith and where lesser sanctions will not suffice." *Id.* at 944. To determine if dismissal should be imposed,

> the court must consider: (1) whether the defendant was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) the practical importance of the evidence; (4) whether the plaintiff acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not excluded.

*Id.* at 945.

OEC destroyed evidence vital to this action on three separate occasions. First, OEC exhumed the Modern Welding tank, prepared a new bedding and backfill, and installed a replacement tank. (Doc. 41-1, p. 24; Doc. 41-3, pp. 3, 7).

Second, OEC failed to preserve the Modern Welding tank once it had been removed from the ground.  (Doc. 41-1, pp. 31, 33).  Third, OEC had destructive testing performed on the tank's bulkhead welds.  (Doc. 35-3).

Before exhuming the tank, OEC consulted with counsel and sent a demand letter to Modern Welding that threatened legal action.  (Doc. 41-1, pp. 52–53).  At that point, OEC's obligation to preserve potential evidence relevant to a future suit should have been clear.  If there was any doubt that removal of the tank would have legal ramifications, Modern Welding's reply to the demand letter removed that doubt.  (Doc. 41-1, pp. 54–57).  Modern Welding requested "four days' written notice of the date on which that tank [was] to be exhumed" and permission "to have a representative present to witness the exhumation and to examine the tank thereafter."  (Doc. 41-1, p. 57).  Modern Welding emphasized that coverage under the tank's limited warranty could hinge on information that came to light during the tank's removal.  (Doc. 41-1, p. 57).

It was important for Modern Welding to witness the tank's removal because the exhumation of a potentially faulty tank offers the best chance to identify defects, and the installation of a new tank necessarily erases signs of improper installation that may have existed in the old bedding.  (Doc. 41-3, p. 7).  OEC ignored Modern Welding's request, but ensured that its own expert was present "to verify that the tank was installed properly and that [OEC] had proper backfill."

10

(Doc. 41-1, pp. 24, 39).  During the tank's removal, the owner of OEC and OEC's expert discussed the possibility of a lawsuit.  (Doc. 41-3, p. 6).  Thus, with full awareness of the likelihood of litigation, OEC made a conscious decision to exhume the tank in Modern Welding's absence and to gather evidence that would support its case while eliminating any opportunity for Modern Welding to preserve favorable evidence.

After the tank was exhumed, OEC was responsible for the tank's transportation and storage.  (Doc. 41-1, p. 31).  Despite knowing that exposure to the sun would cause the tank's fiberglass shell to degrade, the owner of OEC allowed the tank to be stored in an open field for nearly a year before filing suit against Modern Welding.  (Doc. 41-1, pp. 31–33; Docs. 1, 1-1).  Almost nineteen months passed after the exhumation before Modern Welding was able to examine the tank, and by that time "improper storage and preservation, weather exposure, and handling" had made it impossible to "determine what might have caused the crack in the outer fiberglass shell of the Tank."  (Doc. 41-9, p. 9).  OEC's mishandling of the tank further compromised Modern Welding's ability to develop evidence that might have shown the tank was not defective in workmanship or materials.

Finally, after pursuing this legal action for over a year, and well after its deadline for the disclosure of expert witnesses had passed, "OEC had the bottom

portion of the tank cut out and tested" to determine if the bulkhead welds were defective.  (Doc. 44, p. 57; *see also* Doc. 1-1; Doc. 13, ¶ 3).  OEC removed a section of the tank using an oxy-acetylene torch; sawed off specimens from the removed section, which caused the specimens to separate into two pieces; ground the specimens to produce a smooth surface; and then etched the specimens with a mixture of nitric acid and alcohol.  (Doc. 35-3, pp. 2–3).  OEC did not advise Modern Welding that this testing would take place.  Consequently, no representative of Modern Welding was present when a section of the tank was removed.  (Tr. 1/27/15, p. 22).  OEC argues that this conduct does not constitute spoliation because the "portion of the tank that was cut has been preserved and is available" for Modern Welding to test.  (Doc. 44, p. 57).  However, it would be impossible to restore the tank to the condition it was in before a segment of the welds was removed, and whatever Modern Welding might have learned by participating in the testing process has been lost.

Applying the factors described in *Flury* to this action, the Court finds that OEC's actions resulted in severe prejudice to Modern Welding.  As in *Flury*, OEC's "spoliation of critical evidence in this case deprived the opposing party of an opportunity to put on a complete defense."  *Flury*, 427 F.3d at 947.  Tests run during the exhumation of the tank might have revealed a failure to compact the backfill along the tank's bottom quadrant, evidence that would be consistent with

OEC's omission on the tank's installation checklist.  Modern Welding also might have determined that the tank developed a flat spot in the steel compartment and a crack in the fiberglass shell because of improper installation.  If the fiberglass shell of the tank had not been left to decompose in an open field, Modern Welding might have been able to show that the tank was free of defects in materials or workmanship.  If Modern Welding had participated in the testing of the tank's bulkhead welds, Modern Welding might have developed expert testimony regarding the welds' condition and the extent to which the condition could have caused a breach in the tank.  OEC repeatedly destroyed essential pieces of evidence.

The prejudice to Modern Welding cannot be cured because the tank's bedding, backfill, fiberglass shell, and bulkhead welds cannot be restored, and the information these pieces of evidence might have yielded is not otherwise available. The practical importance of this evidence to the case cannot be overstated.  If OEC could prove that the tank's bedding and backfill were properly laid and the fiberglass shell or bulkhead welds contained defects, then OEC might recover under one of its legal theories.  On the other hand, if Modern Welding could establish that the bedding and backfill were improperly laid or the fiberglass shell and bulkhead welds were not defective, then Modern Welding could pursue an affirmative defense.

OEC's spoliation struck at the heart of the matter, and the evidence demonstrates that OEC acted with notice that its failure to inform Modern Welding of the date of the tank's exhumation would unfairly prejudice Modern Welding. Modern Welding sent OEC an unambiguous request for notice of the tank's removal.    OEC did not inadvertently exclude Modern Welding from the exhumation; OEC chose to proceed without Modern Welding.  (Doc. 41-1, p. 21). Even after the exhumation, OEC could have granted Modern Welding's request to examine the tank or taken precautions to preserve the tank, but instead OEC let the tank degrade while OEC prepared its complaint.  Then, in the midst of litigation that already had triggered allegations of spoliation, OEC decided to subject the bulkhead welds to destructive testing, again choosing to gather evidence in a manner that denied Modern Welding equal access to that crucial evidence.  Any one of these instances of spoliation might be sufficient to demonstrate bad faith. Taken together, they demand dismissal.

## III.  CONCLUSION

For the reasons discussed above, the Court **DISMISSES WITH PREJUDICE** all remaining claims in this action.  The Court **DENIES** Modern Welding's motion for summary judgment, Modern Welding's motion to exclude the report and testimony of OEC's expert witness, and OEC's motion to strike the report of Modern Welding's expert because those motions are now moot.   (Docs.

14

35, 40, 45).    The Court will enter a separate order consistent with this memorandum opinion dismissing this action with prejudice.

**DONE** and **ORDERED** this February 23, 2016.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE